Filed 3/9/21  T.F. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| T.F., | |
| Petitioner, | G059663 |
| v. | (Super. Ct. No. 19DP0901) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Antony C. Ufland, Judge. Petition denied.

Bianca Jimenez for the Petitioner, T.F.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Real Party in Interest, Orange County Social Services Agency.

Law Office of Harold LaFlamme and Hannah Gardner for Real Party in Interest, the Minor.

\*          \*          \*

T.F. (Mother) petitions for a writ of mandate to overturn the juvenile court's orders suspending visits with her child, K.F., and terminating family reunification services.  Mother contends insufficient evidence supports the juvenile court's 12-month review finding that she was offered reasonable reunification services.  (Welf. & Inst. Code, § 366.21, subd. (f)(1)(A); all further undesignated statutory references are to the Welfare and Institutions Code.)  Given Mother failed to raise the issue at the disposition or first reunification period, we conclude she forfeited her contention and in any event it lacks merit.  Mother also contends the court erred when it suspended her visitations with K.F., but she has not shown the court abused its discretion.  Accordingly, we deny Mother's writ petition.

I

FACTS AND PROCEDURAL HISTORY

*A. The Juvenile Court's Detention of Mother's Two Youngest Children, K.F. and J.F.*

In May 2019, Mother and her four children moved from Louisiana to California.  Two months later, police officers arrested Mother on allegations she had "ma[de] threats to harm [] staff at [the] [j]uvenile [h]all" where her second-oldest child, teenager Ke.F., was being held after Mother reported that Ke.F. had threatened Mother with a knife.

At the time of Mother's arrest, she had criminal histories in the states of Georgia, Louisiana, and Texas, two outstanding arrest warrants in Georgia and Louisiana,

2

and a Georgia court order for her extradition. Mother claimed the order was "'incorrect and not accurate.'" Mother acknowledged she may have acted "'irrationally'" when she yelled profanities at probation officers, and disclosed she had been taking prescribed medications for bipolar disorder and schizophrenia.

A social worker from Orange County Social Services Agency (SSA) accompanied police officers to Mother's residence. The social worker detected a strong odor of marijuana, found little food in the home, and concluded the two adults there—Mother's boyfriend and Mother's adult child—were under the influence of marijuana. Mother's youngest children, then six year-old K.F. and three-year old J.F., were detained and sent to Orangewood Children and Family Center (Orangewood).

SSA filed a juvenile dependency petition describing K.F. and J.F. as children within section 300, subdivisions (b)(1), (failure to protect), and (g), (failure to provide care after incarceration), alleging they were at risk of harm based on Mother's substance abuse and "mental health[,] and/or anger management issues." Mother denied the allegations, but the court found them to be true and ordered the children to remain under SSA's temporary custody, with Mother granted visitation.

Mother posted a jail bond and met with an assigned SSA social worker. Mother told the social worker she "want[ed] the children returned to her care as soon as possible [but felt] the children could benefit from mental health treatment as well as in home counseling services." At an earlier interview, Mother acknowledged "'my family needs help. We are trying to adjust to moving to California after the death of [Ke.F.]'s father. We all need counseling and I welcome any help that we can get.'" Mother stated she would comply with all recommended services.

The juvenile court ordered SSA to evaluate individuals who Mother believed would take custody of the children, including out-of-state family members SSA would evaluate under the Interstate Compact for Placement of Children (ICPC). The

court also ordered SSA to prepare a formal case plan for Mother and provide reunification services to her.

SSA and Mother stipulated to an initial reunification case plan where she agreed to "follow the recommendations of [a] treating psychiatrist" for medications and "participate in individual, conjoint, family, and/or group therapy with a therapist approved by [SSA,] to address anger management techniques and the allegations in [SSA's] petition." The plan also stipulated Mother would participate in a "12-Step [substance abuse p]rogram," submit to random testing, and have monitored visitations with her children.

In October 2019, about three months after the children had been placed in Orangewood, Mother submitted to the juvenile court a letter showing she was receiving treatments and "doing what she need[ed] to do for her [reunification case] plan." At the same court proceeding, J.B., a man who Mother had earlier identified as J.F.'s father, traveled from Louisiana and appeared in court to establish his paternity. Mother unsuccessfully objected to J.B. visiting J.F.

During this time period, teenager Ke.F. ran away from his foster home in California and Mother e-mailed SSA that "[Ke.F. wa]s going back to New Orleans." By December 2019, Mother had moved back to Louisiana and asked the juvenile court to release Ke.F. to her care, while simultaneously claiming she did not know where Ke.F. was living.[1] Mother also requested the juvenile court to transfer her case to Louisiana. Both requests were denied.[2]

---

[1]     We focus our discussion on children K.F. and J.F. and do not discuss facts about Ke.F. that are not material to our disposition.

[2]     The record shows that, although the juvenile court communicated with a Louisiana court about potentially transferring this case, no formal action for a transfer was initiated in Louisiana.

By January 2020, Mother was incarcerated in a New Orleans jail and J.B. took custody of J.F., over Mother's objections. The following month, the juvenile court ordered SSA to continue custody of K.F., who was placed with a foster parent in California. The court also ordered SSA to continue its ICPC evaluation of Mother's aunt in Texas as a potential placement for K.F. The court approved the case plan agreed to by SSA and Mother, and scheduled a six-month review hearing.

B. *The Juvenile Court's Six-Month Review Period*

Mother was released from a New Orleans jail in March 2020. Before that, an SSA social worker spoke with Mother's case manager at the jail and e-mailed "a copy of [M]other's [c]ase [p]lan and a comprehensive resource guide [about] resources in Louisiana." The SSA social worker also attempted to communicate with a Louisiana social worker to discuss Mother's participation in groups while she was incarcerated.

One week later, Mother called the SSA social worker and acknowledged receiving the list of resources that had been sent to the New Orleans case manager. When the social worker asked Mother whether she was enrolled in any of the reunification programs, Mother responded with profanities, ordering the social worker to "let me know when the case going to be [] transferred [to Louisiana].'"

Over the next three months, the SSA social worker e-mailed Mother asking for an updated address, advising she "would like to refer [Mother] to resources to help meet with requirements of [her] court ordered [c]ase [p]lan." The social worker provided the names, addresses, and telephone numbers for counseling, psychiatric treatment, parenting education, and a 12-Step program, in New Orleans. At the end of May, Mother replied to the SSA social worker with more profanities, writing: "don't email me [] else [] til you got [] date on []."

The following month, in June 2020, Mother was notified her aunt had not qualified to be K.F.'s guardian in Texas, so Mother filed a request in the juvenile court to

5

conduct an ICPC evaluation for the aunt's daughter (Mother's cousin), living at the same Texas residence. When the SSA social worker attempted to discuss Mother's reunification case plan, Mother responded with more profanities, saying: "'Don't ask no questions about me [], when is the paperwork going to be submitted is all I need to know []? We are done [], bye.'"

SSA filed a status report ahead of the juvenile court's six-month review hearing. It recommended continuing to offer Mother reunification services, but noted that, although "[M]other maintained contact with [SSA] . . . , despite multiple requests from [SSA] and [Mother's] attorney, [Mother] refused to provide a current address or [verify] participation in services." The report added SSA "had difficulty engaging [Mother] in services as she continuously refuse[d] involvement in programs and [] exhibited a minimal level of participation with her case plan." The report concluded that "[d]espite being provided with referrals for services, [Mother] requested [SSA to] not contact her. . . . The mother has made no progress."

The juvenile court held its six-month status review hearing in July 2020.[3] The court found Mother's progress had been minimal and "reasonable services ha[d] been provided or offered." Mother, through her counsel, "submit[ted] to [SSA]'s recommendation, and requested the court to allow Mother to personally participate in the hearing telephonically, to order "the ICPC [evaluation] for [her cousin] . . . [,] and [to order] SSA [to] provide [a] progress" update on the evaluation. The court scheduled a 12-month review hearing and ordered "SSA to provide any updates regarding ICPC assessment of [the cousin] to [the c]ourt and counsel." The court adopted SSA's recommendation to continue offering Mother reunification services and ordered Mother's counsel to inform Mother that, per "[s]ection 366.21(e), if the child [could not] be

---

[3]     Two weeks before the review hearing, the juvenile court appointed counsel for D.B., earlier identified as K.F.'s father, and granted his ex parte application to attempt to establish his paternity.

6

returned home by the 12 month permanency hearing, the case [could] be referred to a [s]ection 366.26 hearing that [could] result in the termination of parental rights and the adoption of the child."

C. *The Juvenile Court's 12-Month Review Period*

In September 2020, SSA filed a status review report for the court's 12-month review hearing. It reported the ICPC evaluation for Mother's cousin had been completed and submitted to the state of Texas. On Mother's reunification case plan participation, SSA reported that "[d]uring this period of supervision, the mother continue[d] to not be linked to services . . . [and] . . . continue[d] to refuse to provide any updated information to [SSA] or her attorney regarding her phone number, address[,] or participation in services."

The report contained copies of the social worker's July and August e-mails to Mother which provided information on contacting New Orleans service providers. According to the report, when the social worker attempted to call Mother, it "appear[ed M]other may have changed her phone number again." The report concluded SSA did "not have any information regarding [M]other's participation in services" and noted that, "[d]espite attempts to engage [M]other, [she] continue[d] to not cooperate." The social worker "question[ed] if [M]other believe[d that if K.F. was] moved to Texas through [an] ICPC [placement, still pending at that time], [Mother would] no longer be required to participate in [reunification] services." SSA recommended continuing to pursue reunification services for Mother.

SSA changed its recommendation in an addendum report after the ICPC for Mother's cousin was denied and the cousin reported to SSA she no longer wished to be considered for K.F.'s placement "based on [M]other's behavior." At the same time, Mother engaged in threatening communications to both SSA's social worker and K.F.'s foster mother. For example, among 15 telephone calls she received from Mother in a

7

single day, the SSA social worker reported "receiv[ing] a phone call from [M]other who stated in part she knew where the [social worker] lived and promised to show up."

Mother sent a video to her counsel and the social worker showing Mother singing along to a song with derogatory lyrics, including: "I see murder in my eyes." Mother claimed she also knew where K.F.'s foster mother lived and would show up there, causing the foster mother to change her mind on maintaining care for K.F. K.F. was distraught and cried when told he would be going back to Orangewood. A few days later, Mother made repeated threatening phone calls to Orangewood staff and SSA workers, resulting in criminal charges.

SSA reported it no longer "believe[d] additional reunification [services] time [for Mother] would be in the best interest of [K.F.]" and recommended the juvenile court terminate services and set a hearing to select a permanent plan for K.F. (§ 366.26.) Over Mother's objections, the court granted SSA's requests to keep K.F.'s future placements confidential, to prohibit Mother from directly contacting future caregivers, and to require monitored visitation. The court also scheduled a 12-month review hearing for November.

*D. Suspension of Visitation and Termination of Family Reunification Services*

K.F. returned to Orangewood, but in October 2020 SSA placed him in another foster home. Mother was angry when she learned the family was white and sent text messages to SSA's social worker that included profanities and racial slurs, demanding that K.F. be removed from the family "or I'm in route [*sic*] for you and anyone." Law enforcement was contacted and K.F. was removed from his foster home again. SSA conducted a Child Family Team meeting where Mother expressed her wish for K.F. to be returned "'back with his relatives.'"

After K.F. was placed with another foster parent, K.F. responded during a telephonic visit with Mother that he was being treated well and liked where he was living.

8

When Mother asked K.F. if his foster family was white, an SSA social worker intervened and told Mother she could not ask details about K.F.'s placement. Mother became "irate," yelled a profanity, and the social worker terminated the call. When the social worker followed-up with K.F. through a video call, the child appeared "visibly distraught." Mother's many text messages to the social worker included more profanity-laden threats, such as: "I'm going to show you []" and that the social worker "need[ed] to [be] left for DEAD []."

During the same time period, the SSA social worker again sent Mother information about New Orleans service providers for Mother's reunification case plan. Mother's text message replies included: "STOP SEARCHING FOR ME" and "I dont [sic] need mental health nor substance abuse never been a drug addict nor have I ever needed [someone] to refer me for mental health treatment [] nor parenting white racist []." Mother also texted a depiction of Los Angeles, claiming she had "[j]ust arrived [a] few hours ago" and threatened to find the social worker's spouse. Three days later, K.F.'s foster parent reported that K.F. stated he no longer wished to visit with Mother.

Ahead of the juvenile court's 12-month review hearing, SSA reported it had "not been able to adequately refer [M]other to [c]ourt ordered services as a result of [Mother's] non-compliance." It further reported: "It appears [M]other's mental health is unstable and she has not shown any proof of complying with medical or psychological treatment. [M]other at this time does not have the capacity to provide a safe and protective environment for [K.F.]"

The following day, the juvenile court ordered "Mother's visitation temporarily suspended due to her conduct" and ruled "if [M]other want[ed] to communicate with [K.F., she could] submit written communication[s] to [SSA's] social worker [to forward to the child, if] appropriate." Six days later, the court conducted its 12-month review hearing, where Mother yelled and made threats over the phone. The

9

court found "reasonable services ha[d] been provided or offered" to Mother, ordered reunification services terminated, and set a hearing to determine a permanent plan for K.F., under section 366.26. On visitation, the court added "hopefully, we can get back to some direct communication between Mother and [K.F.], but that's going to require some track record of Mother being able to communicate in ways that are not threatening and abusive." The court set a permanent plan hearing and Mother filed this writ petition.

II

DISCUSSION

A. *Mother Forfeited Her Contention SSA Provided Inadequate Services*

Mother argues SSA provided inadequate reunification services. But as SSA notes, Mother's complaints focus on events occurring the six-month review hearing, but she failed to raise the issue. (§ 366.21, subds. (e)(8) [at six-month review hearing, juvenile "court shall determine whether reasonable services . . . [were] provided or offered to the parent or legal guardian"] & (f)(1)(A) [same at 12-month review hearing].) SSA contends her failure to raise the issue at the six-month review forfeits the issue. We agree.

Mother cites to her communications with SSA in October 2019, about locating a parenting course support her argument she tried to participate in reunification services. But the communications cited occurred nine months before the juvenile court's July 2020 six-month review hearing in this case. Similarly, Mother asserts SSA should have followed up with a Louisiana social worker about classes Mother participated in while incarcerated in New Orleans. But given Mother was released from that jail in March 2020—more than four months before the court's six-month review hearing—the same conclusion applies: Mother failed to object to the court's "reasonable services" finding at its six-month case review. (See *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 810-811 [unfair to trial court and social services agency to give

10

appellate consideration to a point "which could have been presented to, and may well have been cured by, the trial court"].) Mother's failure to object below forfeits the issue on appeal. (See *People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6, quoting *United States v. Olano* (1993) 507 U.S. 725, 733 ["forfeiture is the failure to make the timely assertion of a right"].)

Even if Mother's contention was not forfeited, the issue lacks merit because substantial evidence supports the juvenile court's findings. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 [for factual findings requiring clear and convincing evidence, "the question . . . is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"]) SSA offered Mother adequate reunification services as required by § 366.21, subd. (f)(1)(A); see *In re Julie M.* (1999) 69 Cal.App.4th 41, 48 [reasonableness of services depends on the circumstances of the case].)

The record supports the juvenile court's implicit finding that reasonable services were offered and Mother chose not to participate in the services offered. (See *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220 ["Reunification services are voluntary, and cannot be forced on an unwilling . . . parent"].) There is no evidence Mother responded or complied with SSA's documented attempts to provide her services in 2020. For example, SSA sent five different referrals for psychiatric treatments and another five for parenting education after she moved back to Louisiana at the end of 2019. At the same time, the evidence shows that Mother focused her energy on other issues, such as completing an ICPC evaluation for Mother's aunt and cousin in Texas, in an attempt to have J.F. placed with a relative. Accordingly, Mother's contention SSA did not provide reasonable services lacks merit.

Mother's reliance on *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, is not persuasive. There, a mother was wait-listed in several programs based on a social

11

service agency's referrals. The appellate court reversed the juvenile court's finding that reasonable services had been offered based on "the delays that occurred throughout the dependency in actually getting [the m]other engaged in the identified services." (*Id*. at p. 1242.) *T.J.* is inapt because the lack of parent participation in this case was not based on a lack of accessibility to services, but instead based on Mother's refusal to reciprocate on the services SSA repeatedly offered. (Compare *T.J.*, *supra*, 21 Cal.App.5th at p. 1250 [although the mother's "pugnacious personality made her problematic to deal with, she did cooperate with services in several important ways"].)

## B. Visitation Suspension

Finally, Mother contends her "in person and video visitation should not have been entirely eliminated" because "[t]he totality of visits [between M]other and the child were appropriate." As noted, six days before it conducted its 12-month review hearing, the juvenile court suspended Mother's visitation rights and then kept the suspension intact at the conclusion of the hearing. Specifically, the court ruled that "due to her conduct[, ¶ u]ntil further order, if [M]other want[ed] to communicate with [K.F.,] she [could] submit written communication to the social worker [who would forward] it to the caretaker[,] if [] appropriate."

We review a challenge to a visitation order for abuse of discretion (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1498), in a context where the juvenile "'court is vested with a wide discretion and its determination will not be disturbed in the absence of a manifest showing of abuse.'" (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1044.)

The record shows it was entirely reasonable for the juvenile court to conclude Mother's visits with K.F. had regressed to a point where they were not "consistent with well-being of the child" (§ 362.1, subd. (a)(1)(A) [on orders for foster care placement and reunification services]) and would be "detrimental" to K.F. (§ 366.21, subd. (h) [on continuing visits pending a permanency hearing].)

12

We reject Mother's assertion a "physical threat to [K.F.]" was necessary to justify halting visits. Although Mother correctly cites case law supporting such a narrow interpretation of statutory authority on visitation (see *In re C.C.* (2009) 172 Cal.App.4th 1481, 1491-1492 (*C.C.*) [§ 362.1, subd. (a)(1)(B), requires jeopardy to child's physical safety as the only exception to mandatory visitation]), we do not agree with it, given our conclusion that "the plain language of section 362.1, subdivision (a)[,] only requires visitation as frequently as the well-being of the child allows." (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1219 [disagreeing with *C.C.*].) Here, Mother's threats and verbal abuse caused K.F. emotional distress to the point he no longer wanted to visit with Mother.

In sum, given that substantial evidence supports the juvenile court's implicit factual findings that continuing to allow Mother to visit K.F. would have been inconsistent with K.F.'s well-being (§ 362.1, subd. (a)(1)(A)) and "detrimental" to the child (§ 366.21, subd. (h)), Mother has not shown the court abused its discretion in suspending visits until Mother was able to demonstrate, as the court put it, an ability "to communicate in ways that [were] not threatening and abusive." (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 ["A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence"].)

## III

### DISPOSITION

We deny Mother's petition for a writ of mandate to overturn the juvenile court's orders suspending visitations, terminating reunification services, and setting a permanent plan hearing.

ARONSON, ACTING P. J.

WE CONCUR:

THOMPSON, J.

GOETHALS, J.

14